FILED

2013 Aug-07 PM 03:37
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## MIDDLE DIVISION

| | |
|---|---|
| SANIYA PARRIS, | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | ) **Case No.: 4:12-CV-777-VEH** |
| | ) |
| KEYSTONE FOODS, LLC, | ) |
| | ) |
| **Defendant.** | ) |

---

## MEMORANDUM OPINION AND ORDER

Before the court is the Motion for Summary Judgment (Doc. 19) filed by Defendant Keystone Foods, LLC, d/b/a Equity Group – Alabama Division ("Equity"). The court has considered the arguments made in Equity's "Brief in Support of Motion for Summary Judgment" (Doc. 20) and in its Reply brief (Doc. 22). Plaintiff Saniya Parris ("Ms. Parris"), who is proceeding *pro se*, did not submit a formal response to this Motion. She did file various evidentiary materials, which Equity has moved to strike. Doc. 24. Ms. Parris has also filed a Motion to Strike (Doc. 26) some of the evidentiary materials Equity filed in support of its Summary Judgment Motion. For the following reasons, Equity's Motion for Summary Judgment and Motion to Strike are **GRANTED**, and Ms. Parris's Motion to Strike is **DENIED**.

# I.    Factual Background[1]

Neither party disputes the following material facts. Equity is a "further processing facility" that processes chicken products for various customers and restaurant chains. Doc. 21-5 ¶ 1. The company maintains as official policy a commitment to provide equal employment opportunity for all individuals without regard to race, religion, color, national origin, age, sex, sexual orientation, ancestry, disability, medical condition, veteran status, or marital status. *Id.* ¶ 2. On June 14, 2010, Equity hired Ms. Parris to work in a general utility position within the Offline Department of Equity's Gadsden, Alabama, facility. *Id.* ¶ 7; Doc. 21-1 at 18. Upon her hire, she received and reviewed the company's anti-harassment policy, which she also signed. Doc. 21-1 at 21; Doc. 21-4 at 1.

Ms. Parris, who identifies as transgender, was born biologically male but presented as a female at the time of her hire and throughout her employment with

---

[1] The court provides the following statement of facts keeping in mind that, when deciding a motion for summary judgment, it must view the evidence and all factual inferences in the light most favorable to the party opposing the motion. *See Optimum Techs., Inc. v. Henkel Consumer Adhesives, Inc.*, 496 F.3d 1231, 1241 (11th Cir. 2007) (observing that, in connection with summary judgment, a court must review all facts and inferences in a light most favorable to the non-moving party) (citation omitted). This statement does not represent actual findings of fact. *See In re Celotex Corp.*, 487 F.3d 1320, 1328 (11th Cir. 2007). Instead, the court has provided this statement simply to place the court's legal analysis in the context of this particular case or controversy. Further, due to the nature of this court's decision on summary judgment, the foregoing factual statement is limited in scope. More specifically, facts that are not material to the court's ruling on summary judgment have not been included in this background.

Equity. Doc. 21-1 at 25. When the company initially hired Ms. Parris, her paperwork indicated that her name was "K'Shun A. Nelson." Doc. 21-5 ¶ 3. Her correct legal name at that time, however, was "Andrew K'Shun Nelson," and the company had her change her paperwork to reflect that. *Id.* ¶¶ 4-5. In the workplace, Ms. Parris initially went by the name "K'Shun." Doc. 21-1 at 25. On or around October 22, 2010, Ms. Parris announced that she should be referred to as "Saniya Lashai Marai Parris" from thereon. Doc. 21-5 ¶ 8; *see also* Doc. 21-4 at 17. After she was issued a new Social Security card with that name, Equity altered her personal information within its database to reflect the change. Doc. 21-1 at 28; *see also* Doc. 21-4 at 18.

Equity has established a "progressive discipline" policy for its employees that dictates a scaled list of punishments for various infractions, with the sanctions ranging from verbal warnings to termination. *See* Doc. 21-4 at 5-6. On June 23, 2010, Equity issued Ms. Parris her first verbal warning for alleged tardiness. *Id.* at 15. On January 7, 2011, she received her second verbal warning over an alleged dispute with a co-worker. *Id.* at 20. She received a written warning on January 13, 2011, for allegedly failing to obey her supervisor's instructions. *Id.* at 21. On January 31, 2011, Equity suspended Ms. Parris from work for several days over her alleged misuse of machine equipment. *Id.* at 22.

Ms. Parris called the company hotline on February 23, 2011, to complain about

her workplace treatment. *See* Doc. 21-4 at 25-27. When she was asked why she was calling, she replied, "harassment/discrimination." *Id.* at 26. When asked what type of harassment she was reporting, she replied, "Sexual. My life style. I'm in transition." *Id.* She explained that she thought that the Human Resources Department ("Human Resources") had unfairly handled her suspension. *See id.* at 26-27. On or around March 23, 2011, Bobby Crays, Ms. Parris's supervisor at that time, accused her and two other female employees of disappearing from their positions. *Id.* at 32, 36; Doc. 21-5 ¶ 15. He decided to remove Ms. Parris from that position but not the other employees. *Id.* Upon learning of this decision, Ms. Laurel Hale ("Ms. Hale") of Human Resources instructed Mr. Crays to return Ms. Parris to her previous position, which he did. Doc. 24-1 at 32, 36; Doc. 21-5 ¶ 16.

Equity terminated Ms. Parris from her employment on April 6, 2011, after she allegedly failed to return from her break on time. *See* Doc. 21-4 at 23. Following her termination, Ms. Parris filed another formal complaint with the company hotline alleging "Discrimination of Personal Lifestyle." Doc. 21-5 ¶ 19. She also filed a grievance with the union that represented her. *Id.* After having its officials meet with Ms. Parris and Ms. Hale, the union elected not to pursue her grievance any further. *Id.*

## II.     Procedural Posture

4

Ms. Parris filed a "Charge of Discrimination" with the Equal Employment Opportunity Commission ("EEOC") on October 7, 2011. Doc. 21-4 at 38. On December 15, 2011, the EEOC dismissed her charge and issued her a notice of her right to sue. *Id.* at 42.

She filed her Complaint with this court on March 9, 2012. Doc. 1. She alleged that Equity violated Title VII of the Civil Rights Act of 1964 by terminating her "because of her sex (gender nonconformity) and/or in retaliation for her having complained of unlawful workplace termination." *Id.* ¶ 15. On April 18, 2012, Equity filed its Answer. Doc. 8. On September 27, 2012, Equity filed a Motion to Dismiss (Doc. 15), which the court granted in part and denied in part in an Order dated October 1, 2012 (Doc. 16). Equity filed the present Motion on November 29, 2012. Doc. 19. It filed a brief and evidentiary material in support of this motion on the same date. Docs. 20, 21. On January 3, 2013, Equity filed a Reply Brief. Doc. 22. Ms. Parris filed evidentiary materials on January 8, 2013. Doc. 23. On January 18, 2013, Equity moved to strike this material (Doc. 24), and Ms. Parris moved to strike Equity's evidentiary material on April 17, 2013 (Doc. 26).

## III.   Equity's Motion to Strike

The court must first resolve Equity's Motion to Strike Ms. Parris's evidentiary materials because it affects how the court will evaluate Equity's Motion for Summary

Judgment. Equity argues for striking said evidentiary materials because they were filed several weeks after the court's imposed deadlines and because they do not conform to the court's formatting prescriptions. Doc. 24 at 1-3. Equity is correct that Ms. Parris unjustifiably filed her materials late. While the complaints of *pro se* litigants should be liberally construed, "[l]iberal construction does not mean liberal deadlines." *Wayne v. Jarvis*, 197 F.3d 1098, 1104 (11th Cir. 1999) (citation omitted), *overruled in part on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc). More importantly, Ms. Parris did not file a brief or otherwise explain why she filed her materials late. Further, her assertions in these documents are not under oath or declaration and thus are not in proper form. For these reasons, the court will **GRANT** Equity's Motion to Strike and will consider its Motion for Summary Judgment unopposed.

## IV.    Standard of Review

Under Federal Rule of Civil Procedure 56, summary judgment is proper if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) ("[S]ummary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that

the moving party is entitled to a judgment as a matter of law.") (internal quotation marks omitted).[2]   The party requesting summary judgment always bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings or filings that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 323. Once the moving party has met its burden, Rule 56(e) requires the non-moving party to go beyond the pleadings in answering the movant. *Id.* at 324. By its own affidavits – or by the depositions, answers to interrogatories, and admissions on file – it must designate specific facts showing that there is a genuine issue for trial. *Id.*

The underlying substantive law identifies which facts are material and which are irrelevant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). All reasonable doubts about the facts and all justifiable inferences are resolved in favor of the non-movant. *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (citation omitted). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248. A dispute is genuine "if the evidence is such that a

---

[2]Congress amended Rule 56 in 2007 in conjunction with a general overhaul of the Federal Rules of Civil Procedure. The Advisory Committee was careful to note, however, that the changes "are intended to be *stylistic only*." Adv. Comm. Notes to Fed. R. Civ. P. 56 (2007 Amends.) (emphasis added). Consequently, cases interpreting the previous version of Rule 56 are equally applicable to the revised version. *E.g.*, *Wooten v. Walley*, No. 2:07-CV-701-WKW[WO], 2008 WL 4217262, at *2 n.5 (M.D. Ala. Sep. 12, 2008).

reasonable jury could return a verdict for the nonmoving party." *Id.* If the evidence presented by the non-movant to rebut the moving party's evidence is merely colorable, or is not significantly probative, summary judgment may still be granted. *Id.* at 249 (internal citations omitted).

How the movant may satisfy its initial evidentiary burden depends on whether that party bears the burden of proof on the given legal issues at trial. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citation omitted). If the movant bears the burden of proof on the given issue or issues at trial, then it can only meet its burden on summary judgment by presenting *affirmative* evidence showing the absence of a genuine issue of material fact – that is, facts that would entitle it to a directed verdict if not controverted at trial. *Id.* (citation omitted). Once the moving party makes such an affirmative showing, the burden shifts to the non-moving party to produce "significant, probative evidence demonstrating the existence of a triable issue of fact." *Id.* (citation omitted).

For issues on which the movant does not bear the burden of proof at trial, it can satisfy its initial burden on summary judgment in either of two ways. *Id.* at 1115-16 (citation omitted). First, the movant may simply show that there is an absence of evidence to support the non-movant's case on the particular issue at hand. *Id.* at 1116. In such an instance, the non-movant must rebut by either (1) showing that the record

in fact contains supporting evidence sufficient to withstand a directed verdict motion, or (2) proffering evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Id.* at 1116-17 (citation omitted). When responding, the non-movant may no longer rest on mere allegations; instead, it must set forth evidence of specific facts. *Lewis v. Casey*, 518 U.S. 343, 358 (1996) (citation omitted). The second method a movant in this position may use to discharge its burden is to provide affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial. *Fitzpatrick*, 2 F.3d at 1116. When this occurs, the non-movant must rebut by offering evidence sufficient to withstand a directed verdict at trial on the material fact sought to be negated. *Id.*

As noted, Ms. Parris is proceeding *pro se* in this case. Although factual inferences must be viewed in a light most favorable to the nonmoving party and *pro se* complaints are entitled to liberal interpretation by the courts, a *pro se* litigant does not escape the burden of establishing by sufficient evidence a genuine dispute of material fact. *Brown v. Crawford*, 906 F.2d 667, 670 (11th Cir. 1990) ("Although we must view factual inferences favorably toward the nonmoving party and *pro se* complaints are entitled to a liberal interpretation by the courts, we hold that a *pro se* litigant does not escape the essential burden under summary judgment standards of establishing that there is a genuine issue as to a fact material to his case in order to

avert summary judgment.") (citations omitted).

## V.    Discussion

Because Equity need not prove liability at trial, it can meet its burden here either by (1) showing an absence of evidence to support Ms. Parris's case on this issue, or by (2) presenting affirmative evidence demonstrating that Ms. Parris will be unable to prove her case at trial. *Fitzpatrick*, 2 F.3d at 1115-1117. As explained below, Equity has met this burden on both Ms. Parris's discriminatory discharge claim and her retaliation claim. It has shown that Ms. Parris cannot substantiate a key element of her prima facie case asserting gender discrimination in her dismissal. Even if she has satisfied her prima facie case, Equity has proven that she cannot expose as pretext its legitimate reasons for dismissing her. Equity also shows that she could not show such pretext in her illegal retaliation claim. Because Ms. Parris cannot identify a genuine issue of material fact on any these issues, Equity merits summary judgment on both of her claims.

### A. Ms. Parris was not required to arbitrate her claims.

Equity first moves for dismissal on a preliminary ground. It maintains that Ms. Parris's union signed a Collective Bargaining Agreement (CBA) which commits this matter to arbitration and that the parties have already exhausted this avenue. Doc. 20 at 20-21. In making this argument, Equity relies exclusively on the Supreme Court's

recent ruling in *14 Penn Plaza LLC v. Pyett*, 556 U.S. 247 (2009) ("*14 Penn Plaza*"). *Id.* at 21. As a ruling in favor of Equity on this ground would forestall consideration of Ms. Parris's substantive claims, the court must address it first. For the reasons set out below, the court finds Equity's argument unpersuasive.

### 1. Legal Framework

The validity of an arbitration agreement is generally governed by the Federal Arbitration Act, 9 U.S.C. §§ 1-307 (the "FAA"), which "was enacted in 1925 to reverse the longstanding judicial hostility toward arbitration." *Caley v. Gulfstream Aerospace Corp.*, 428 F.3d 1359, 1367 (11th Cir. 2005). Consistent with that objective, "[t]he FAA creates a strong federal policy in favor of arbitration," under which "courts rigorously enforce arbitration agreements." *Picard v. Credit Solutions, Inc.*, 564 F.3d 1249, 1253 (11th Cir. 2009) (citations and internal quotation marks omitted). "[T]he FAA creates a presumption in favor of arbitrability; so, parties must clearly express their intent to exclude categories of claims from their arbitration agreement." *Lambert v. Austin Ind.*, 544 F.3d 1192, 1197 (11th Cir. 2008) (citation omitted). In that regard, "federal policy requires us to construe arbitration clauses generously, resolving all doubts in favor of arbitration." *Becker v. Davis*, 491 F.3d 1292, 1305 (11th Cir. 2007) (citation omitted), *abrogated on other grounds by Arthur Andersen LLP v. Carlisle*, 556 U.S. 624 (2009). "Generally, a court should enforce

an arbitration agreement according to its terms, and no exception exists for a cause of action founded on statutory rights." *Davis v. S. Energy Homes, Inc.*, 305 F.3d 1268, 1273 (11th Cir. 2002) (citation omitted). Under the FAA, arbitration agreements are enforceable except where state or federal law provides grounds for their revocation. *Pendergast v. Sprint Nextel Corp.*, 592 F.3d 1119, 1133 n.13 (11th Cir. 2010) (citation omitted).

"The FAA reflects the fundamental principle that arbitration is a matter of contract" and "places arbitration agreements on an equal footing with other contracts." *Rent–A–Center, W., Inc. v. Jackson*, 130 S. Ct. 2772, 2776, 177 L. Ed. 2d 403 (2010). Accordingly, in construing arbitration agreements, courts apply state-law principles relating to ordinary contract formation and interpretation, viewed through the lens of the federal policy favoring arbitration. *See Caley,* 428 F.3d at 1368 ("[I]n determining whether a binding agreement arose between the parties, courts apply the contract law of the particular state that governs the formation of contracts.").

Under Alabama law, arbitration provisions are to be treated like any other contractual provision. *Serv. Corp. Int'l v. Fulmer*, 883 So. 2d 621, 633 n.15 (Ala. 2003) (citation omitted). "A party seeking to compel arbitration must prove (1) the existence of a contract containing an arbitration agreement and (2) that the underlying contract evidences a transaction affecting interstate commerce." *Allied Williams Cos.,*

12

*Inc. v. Davis*, 901 So. 2d 696, 698 (Ala. 2004) (quotation omitted). If the moving party makes the requisite showing, the burden shifts to the opposing party to present evidence either that the arbitration agreement is not valid or that it does not apply to the dispute in question. *Id.* (citation omitted).

### 2. Analysis

Neither party disputes that Alabama law governs the CBA's interpretation in this case. Under this law, Equity has adequately proven the existence of an arbitration agreement revealing a transaction affecting interstate commerce, which Ms. Parris does not rebut. Equity has not shown, however, that the agreement applies to Ms. Parris's claims. The United Food and Commercial Workers Union, Local No. 1995, represented Ms. Parris while she was employed with Equity. *See* Doc. 21-1 at 20; Doc. 21-3 at 2. It had entered into a CBA with Equity for the period covering March 1, 2009, through March 3, 2013 – that is, covering the period of Ms. Parris's employment. Doc. 21-3 at 1. The CBA's Article Two provided that "[t]he employer and the Union agree that they shall observe all applicable laws prohibiting discrimination." *Id.* at 3. Article Seven outlined the grievance and arbitration procedures to be followed after a claimed agreement violation. *Id.* at 5-6. As to the scope of this clause, the article's language is vague. Section 7.1 reads:

> The parties agree that there are to be no lockouts, strikes, slowdowns or

> stoppage of and/or interference with work during the life of this Agreement. In the event of a claimed violation of this Agreement, the employee or the Union shall follow the grievance procedure set forth below. The Union has the authority to submit grievances to arbitration and to withdraw and settle grievances. Time is of the essence and the time limits shall be strictly observed.

*Id.* at 5. No other section in Article Seven addresses what types of claims are covered under its provisions.

Such language is insufficient to commit Ms. Parris's claims to arbitration. According to the Supreme Court, "an agreement to arbitrate statutory antidiscrimination claims [must] be 'explicitly stated' in the collective-bargaining agreement." *14 Penn Plaza*, 556 U.S. at 258 (quoting *Wright v. Universal Mar. Serv. Corp.*, 525 U.S. 70, 82 (1998)). That is, only a CBA that "clearly and unmistakably" requires union members to arbitrate statutory antidiscrimination claims is enforceable as a matter of federal law. *See id.* at 274 (holding such in the context of the Age Discrimination in Employment Act ("ADEA")).[3] The CBA here does not meet this high standard. Indeed, it fails to address the arbitrability of statutory antidiscrimination claims altogether. Even under the deferential standards dictated by the FAA, the court is unable to hold that the agreement prevents Ms. Parris from

---

[3] Although *14 Penn Plaza* addressed the arbitrability of ADEA claims specifically, the Court's holding is relevant to analogous antidiscrimination claims. *See Bender v. A.G. Edwards & Sons, Inc.*, 971 F.2d 698, 700 (11th Cir. 1992) (per curiam) (seeing "no reason to distinguish between ADEA claims and Title VII claims" in the context of arbitration) (citing *Alford v. Dean Witter Reynolds, Inc.*, 939 F.2d 229, 230 (5th Cir. 1991)).

using a federal forum to seek redress for her claimed injuries.

**B. Equity has shown that Ms. Parris fails to make her prima facie case for sex discrimination.**

Ms. Parris first claims that Equity violated Title VII by terminating her employment on the basis of nonconformity with her sex. Doc. 1 ¶ 15. Specifically, Ms. Parris, who identifies as transgender, asserts that Equity discharged her because she failed to adhere to conventional gender roles and stereotypes. Doc. 21-1 at 11. Title VII covers such claims. *See Glenn v. Brumby*, 663 F.3d 1312, 1317 (11th Cir. 2011) ("[D]iscrimination against a transgender individual because of her gender-nonconformity is sex discrimination, whether it's described as being on the basis of sex or gender . . . These instances of discrimination against plaintiffs because they fail to act according to socially prescribed gender roles constitute discrimination under Title VII . . ."); *see also Price Waterhouse v. Hopkins*, 490 U.S. 228, 251 (1989) ("[I]n forbidding employers to discriminate against individuals because of their sex, Congress intended to strike at the entire spectrum of disparate treatment of men and women resulting from sex stereotypes") (quoting *Los Angeles Dept. of Water and Power v. Manhart*, 435 U.S. 702, 707, n.13 (1978))*, superseded in part on other grounds by* 42 U.S.C. § 2000e-5(g)(2). But, Ms. Parris has failed to present evidence to establish her prima facie case that Equity discriminated against her in this manner.

### 1. Legal Framework

Title VII prohibits an employer from discharging an employee on the basis of sex. 42 U.S.C. 2000e-2(a)(1). Under this statute, a plaintiff like Ms. Parris must ultimately prove that her employer bore discriminatory intent in making the termination decision. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000) ("The ultimate question in every employment discrimination case involving a claim of disparate treatment is whether the plaintiff was the victim of intentional discrimination."). The plaintiff may prove discriminatory intent through either direct or circumstantial evidence. *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99-100 (2003). Direct evidence of discriminatory intent is rare. *See U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983) ("There will seldom be 'eyewitness' testimony as to the employer's mental processes."). Such evidence may take the form of facially-discriminatory employment policies, job assignments, or employer statements. *See, e.g, Ferrill v. Parker Group, Inc.*, 168 F.3d 468, 472 (11th Cir. 1999) (holding that telephone-marketing corporation's pre-election campaign, in which African-American employees were assigned to call African-American voters using "black script," while white employees called white voters using "white script," was direct evidence of disparate treatment on basis of race).

When a plaintiff seeks to prove discriminatory intent through circumstantial

evidence, a court usually evaluates the claim under the reputed *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973).[4] Under this scheme, the plaintiff first has the burden of proving a prima facie case of discrimination by a preponderance of evidence. In a discriminatory discharge claim of the kind asserted here, the plaintiff makes such a case by proving that: (1) she is a member of a protected class; (2) she was subjected to adverse employment action; (3) her employer treated similarly-situated, gender-conforming employees more favorably; and (4) she was qualified to do the job. *See Maniccia v. Brown*, 171 F.3d 1364, 1368 (11th Cir. 1999). Discharging this burden is not onerous. *Tex. Dept. of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) ("*Burdine*"). The plaintiff need only establish facts adequate to permit a discriminatory inference. *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997).

Once the plaintiff has made out the elements of the prima facie case, the burden of production shifts to the employer to articulate a non-discriminatory basis for its

---

[4] In proving discriminatory intent circumstantially, a plaintiff need not conform rigidly to the *McDonnell Douglas* framework. *Vessels v. Atlanta Ind. Sch. Sys.*, 408 F.3d 763, 768 n.3 (11th Cir. 2005) (emphasizing that the *McDonnell Douglas* framework "remains only one method by which the plaintiff can prove discrimination by circumstantial evidence" and that it "is not the exclusive means of proof") (citing *Lee v. Russell County Bd. of Educ.*, 684 F.2d 769, 773 (11th Cir. 1982)).

employment action. *Burdine*, 250 U.S. at 253.[5] If the employer meets this burden, the discriminatory inference disappears, and the plaintiff may then show by a preponderance of the evidence that the proffered reasons were pretextual. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 510-11 (1993). Where the plaintiff succeeds in discrediting the employer's proffered reasons, the trier of fact may conclude that the employer intentionally discriminated. *Reeves*, 530 U.S. at 148.

Ms. Parris seeks to prove Equity's discriminatory intent circumstantially. That is, she offers evidence of disparate treatment during her employment with Equity from which (she claims) a fact-finder may infer that Equity had a discriminatory motive in releasing her. Equity shows, however, that she fails even to make her prima facie case. It does not dispute that she was a member of a protected class or that she was subject to an adverse employment action (i.e. termination). Doc. 20 at 25. Rather, it argues that Ms. Parris was not qualified for her position and that she cannot (and does not) identify similarly-situated, gender-conforming employees whom Equity treated more favorably than her. *Id.* at 25-26. More generally, it contends that she provides no evidence from which one may properly infer it had discriminatory intent

---

[5]While the burden of production shifts, the burden of persuasion on the issue of discriminatory intent always remains with the plaintiff. *Id.* ("The nature of the burden that shifts to the defendant should be understood in light of the plaintiff's ultimate and intermediate burdens. The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.") (citations omitted).

in discharging her. While Equity is unconvincing on Ms. Parris's job qualification, it is persuasive on the second front.

### 2. Job Qualification

In its supporting brief, Equity argues that Ms. Parris has not proven her professional qualifications. Doc. 20 at 25. It highlights her failure to verify her satisfactory job performance. *Id.* This critique overstates the *McDonnell Douglas* job qualification element. In fact, in termination cases, the question of whether a plaintiff was qualified to do the job is not often at issue. *Crapp v. City of Miami Beach*, 242 F.3d 1017, 1020 (11th Cir. 2001). "[I]n cases where a plaintiff has held a position for a significant period of time, qualification for that position sufficient to satisfy the test of a *prima facie* case can be inferred." *Rosenfield v. Wellington Leisure Prods., Inc.*, 827 F.2d 1493, 1495 n.2 (11th Cir. 1987). Thus, "allegations of poor performance against plaintiffs discharged from long-held positions may be properly considered . . . when a court evaluates the pretextual nature of an employer's proffered nondiscriminatory reasons for termination." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1360 (11th Cir. 1999) (citations omitted). Basically, a plaintiff in such a case need only show that she satisfied her employer's *objective* qualifications. *Vessels*, 408 F.3d at 769 (emphasis added).

Under this lenient standard, Ms. Parris has satisfied her prima facie case for

summary judgment purposes. Equity hired her for a general utility position in the Offline Department of its Gadsden facility on June 14, 2010, after personally interviewing her and reviewing her work experience. Doc. 21-5 ¶¶ 3-4, 7.[6] She maintained her employment with the company until April 6, 2011. *Id.* ¶ 17. Equity claims that it discharged her after continuously disciplining her over the early part of 2011, and it offers other evidence of her deficient job performance. *See id.* ¶¶ 9-17. But these subjective complaints, which Ms. Parris sharply disputes, do not enter the court's analysis at the prima facie stage. *See Holifield*, 115 F.3d at 1562 n.3 (holding that, because the issue of plaintiff's job performance was intertwined with the issue of whether his termination was pretextual, his job performance wouldn't be examined until a later stage of the *McDonnell Douglas* analysis). Rather, the court may infer from Equity's mere decision to hire Ms. Parris and to maintain her in its employ for the time that it did (approximately ten months) that Ms. Parris was "qualified for [her] position" for the purposes of a prima facie case in a discriminatory discharge case such as this one.

### 3. Comparative Employee Treatment

---

[6]Equity asserts in its brief that it has since discovered evidence that Ms. Parris lied in her employment application regarding certain aspects of her work history and that it would not have hired her had it known of her deception. *See* Doc. 20 at 2, 30. As resolution of this factual dispute would not affect the court's conclusion that Ms. Parris has adequately made her prima facie case on the job qualification element for summary judgment purposes, the court will not address it.

Equity more persuasively argues that Ms. Parris cannot show that Equity treated similarly-situated employees outside her classification more favorably than Ms. Parris. *See Coutu v. Martin Cty. Bd. of Cty. Comm'rs*, 47 F.3d 1068, 1073 (11th Cir. 1995). To effect this comparison, a plaintiff must show that she and the identified employees ("comparators") are similarly situated in *all relevant respects*. *Holifield*, 115 F.3d at 1562 (citations omitted) (emphasis added). Thus, it is necessary for the court to consider whether the comparators are involved in or accused of the same or similar conduct and are disciplined in different ways. *Burke-Fowler v. Orange County, Fla.*, 447 F.3d 1319, 1323 (11th Cir. 2006) (citation omitted). The quantity and quality of the comparator's misconduct must be "nearly identical" to the plaintiff's so as to prevent courts from "second-guessing employers' reasonable decisions and confusing apples with oranges." *Maniccia*, 171 F.3d at 1368 (citation omitted).[7] If the plaintiff fails to show the existence of a similarly-situated employee in this manner, summary judgment is appropriate where no other evidence of discrimination is present. *Holifield*, 115 F.3d at 1562 (citation omitted).

Given this articulation, Ms. Parris must establish that (1) she was terminated

---

[7] Although the "nearly identical" misconduct requirement was called into question by *Alexander v. Fulton County, Ga.*, 207 F.3d 1303, 1334 (11th Cir. 2000) (citations omitted), the court is "bound to follow *Maniccia*'s 'nearly identical' standard rather than the standard articulated by *Alexander* because, when a later panel decision contradicts an earlier one, the earlier panel decision controls." *Burke-Fowler v. Orange Cnty., Fla.*, 447 F.3d 1319, 1323 n.2 (11th Cir. 2006) (citation omitted).

(2) when at least one other gender-conforming Equity employee was not (3) who was in nearly identical circumstances as Ms. Parris at the time of her termination. Equity has shown that there is no genuine factual dispute over the nonexistence of such an employee. According to Equity, it fired Ms. Parris on April 6, 2011, when she failed to clock out for several minutes after going on break (thus impermissibly extending her break beyond the allotted time without reporting such to the company). Doc. 20 ¶ 51. As this disciplinary infraction followed three previous ones – including a verbal warning on January 7, 2011, a written warning on January 13, 2011, and a suspension on January 31, 2011 – the company claims it discharged her under its "progressive discipline" policy. *Id.* ¶ 54. In her deposition, Ms. Parris, although alleging some discrepancies surrounding her termination, admitted that the company may have had a legitimate reason for penalizing her last disciplinary violation. Doc. 21-1 at 45. While she disputed the legitimacy of her earlier violations, she still acknowledged that the final one was the fourth in a progression and thus might have been grounds for termination under company policy. *Id.* at 45, 82.

According to Equity, two other employees – Ashley Simms and Saleria Cash – were also observed failing to clock out along with Ms. Parris on April 6, 2011. Doc. 20 ¶ 51. Because they did not have any prior disciplinary violations, Equity did not terminate them. *Id.* ¶ 53. It is unclear from her deposition testimony whether Ms.

Parris was aware of this fact. She complains at one point that Ms. Cash sometimes failed to swipe her card, although she does not point to a specific instance. Doc. 21-1 at 77. She also alludes generally to "other people" on her termination date who didn't clock out on-time as well, but she was not sure who they were nor whether they were disciplined. *Id*. She does *not* claim (much less substantiate) that Ms. Simms or Ms. Cash were in "nearly identical" circumstances as her own and were yet treated more favorably. That is, she does not dispute Equity's assertion that Ms. Simms and Ms. Cash each had a different disciplinary history that justified their relatively lenient treatment. Nor does she actively identify *anyone* with her particular history who impermissibly extended their break as she did and yet was not terminated.

Ms. Parris does reference another incidence of alleged disparate treatment before her termination. At one point, when Ms. Parris was working in the "depurge" area of the facility, her supervisor at the time accused her and two female co-workers of disappearing on the job. Doc. 20 ¶ 46; Doc. 21-1 at 42-43. Although he moved Ms. Parris to another area with different responsibilities, he did not do so with her co-workers. Doc. 20 ¶ 48; Doc. 21-1 at 42-43. But, Ms. Parris admits that management quickly rectified this discrepant treatment; after being notified of this action, Ms. Hale instructed Ms. Parris's supervisor to return her to "depurge." Doc. 21-1 at 42-43. Regardless, this incident does not suffice to make Ms. Parris's prima facie case. She

does not provide evidence as to the personal circumstances of the female co-workers in question, the degree to which their backgrounds within the company matched hers, or the extent of their gender conformity. Nor does she illustrate how, if at all, her supervisor's action related to her termination. Equity does not maintain, and she does not assert, that it contributed to her discharge.

### 4.    Stray Biased Remarks

More generally, Ms. Parris has not offered any factual evidence from which a fact-finder could infer discriminatory intent behind her termination. She devotes much time in her deposition testimony to describing what she perceived as the discriminatory workplace environment she faced during her employment. She identifies the following actions and comments she encountered during her employment with Equity:

- Even after she changed her name to "Saniya," some co-workers continued to call her "K'Shun" or "Andrew." *Id.* at 29.

- She once overheard a co-worker tell someone that she was "not a real girl." *Id.*

- She was once told by a co-worker that Tyler Smith, her supervisor for a time, had told someone else that she referred to herself as "K'Shun" but "that her real name [was] Andrew." *Id.* at 30.

- She believed that Mr. Smith had divulged her former legal name to her co-workers. *Id.* at 67.

- She was once told by a co-worker that there was a rumor that she had stated that she would not have a sex change operation because she was afraid of the pain. *Id.* at 29.

- She was once told by a co-worker that she could get in trouble for using the women's restroom. *Id.* at 32.

- Mr. Smith brought her into a meeting where he discussed co-worker accusations that she was inappropriately hugging others in the workplace. *Id.* at 34.

- On another occasion, Ms. Hale spoke to her about inappropriately touching a co-worker. *Id.* at 36-37.

- A co-worker referred to her as "shehim" once, "dude" more than twice, and "nigga" once or twice. Another co-worker consistently called her "A." *Id.* at 68.

- A co-worker once cursed her and pushed her face during an argument. *Id.* at 46-47.

- A co-worker began to treat her more rudely once he learned of her former legal name. *Id.* at 53-54.

- Two co-workers switched the ticket labels on the meat vats in order to confuse her and thus damage her job performance. *Id.* at 54-55.

- In a meeting over her inadequate job performance, Mr. Smith referred vaguely to her girlish "mannerisms" and mentioned that she "tr[ied] to act like a girl." *Id.* at 59.

Discriminatory comments made by an employer or workplace decision-maker can qualify as direct evidence of discrimination. *See Miles v. M.N.C. Corp.*, 750 F.2d 867, 873-76 (11th Cir. 1985) (holding that a racial slur made by a person in charge of

making employee evaluations and suggestions for rehiring constitutes direct evidence of discrimination). In such cases, the *McDonnell Douglas* framework is unnecessary. *Id.* at 875 (footnote omitted). But, when such statements are made by an actor uninvolved in the claimed discriminatory action, they are irrelevant as direct evidence. *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1330 (11th Cir. 1998) ("[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.") (citing *E.E.O.C. v. Alton Packaging Corp.*, 901 F.2d 920, 924 (11th Cir. 1990)); *see also Price Waterhouse*, 490 U.S. at 277 (O'Connor, J., concurring) ("Stray remarks in the work place . . . unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden.") (internal citation omitted).

Even if Ms. Parris wanted to use the above statements as circumstantial evidence of discriminatory intent, she would still have to plausibly impute them to those responsible for her termination. As Equity shows, she has not done so. Many of the comments qualify as hearsay (if not double hearsay) and are thus unreliable. Most are attributed to co-workers who had no authority over her. Those ascribed to Tyler Smith, her supervisor for a limited period of time, are arguably discriminatory. She does not assert, however, that he had anything to do with her termination. In fact, according to her deposition testimony, he had left the company by the time she was

discharged. Doc. 21-1 at 19.

Ms. Parris highlights two exchanges she had with Ms. Hale, her Human Resources Manager: (1) when she presented an internal complaint to Ms. Hale, Ms. Hale allegedly told her that she should disqualify herself from her current position and move elsewhere; and (2) when she complained about harassment on another occasion, Ms. Hale allegedly opined that she was only complaining because she had been recently suspended for a disciplinary violation. *Id.* at 60, 58. She did not complain to the company hotline about these incidents, nor does she have any contemporaneous documentation that might substantiate them. *Id.* at 60. Even if Ms. Parris's description of these interactions is entirely accurate, however, it simply does not follow from them that Ms. Hale or anyone else in management possessed discriminatory intent in terminating her. Ms. Parris might very well have been treated unkindly during her time with Equity. But "[u]nfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful employment practice under Title VII." *Coutu*, 47 F.3d at 1074.

### C. Even if Ms. Parris has made her prima facie case, Equity has shown that she cannot prove that its legitimate reasons for discharging her were pretextual.

Assuming Ms. Parris has made out a prima facie case for discrimination, Equity still merits summary judgment. It has articulated a legitimate, nondiscriminatory

reason for her termination that rebuts the discriminatory inference, and Ms. Parris has not offered any evidence that the company's justification acted as a pretext for sex discrimination.

### 1.   Legal Framework

In order to rebut an employee's prima facie case successfully, an employer must "clearly set forth, through the introduction of admissible evidence, the reasons for the plaintiff's rejection." *Burdine*, 450 U.S. at 255 (footnote omitted). The employer must be sufficiently specific so as to give the plaintiff "a full and fair opportunity to demonstrate pretext." *Id.* at 255-56; *see also Miles*, 750 F.2d at 867 (holding that an employer's vague, subjective reasons for the challenged employment action may be insufficient because they "do not allow a reasonable opportunity for rebuttal") (footnote omitted). The employer need not prove, however, "that it was actually motivated by the proffered reasons." *Burdine*, 450 U.S. at 254. Rather, it need only produce evidence of its nondiscriminatory termination rationale sufficient to raise a genuine factual issue as to whether it discriminated against the plaintiff. *Id.* (footnote omitted). If it does so, it has rebutted the employee's case.

### 2.   Analysis

Equity has adequately rebutted Ms. Parris' case. It has proven that Ms. Parris's failure to clock out on April 6, 2011, was her fourth disciplinary transgression in a

matter of months. While Ms. Parris challenges these violations' merits, she admits that she was so penalized on these occasions. *See* Doc. 21-1 at 44. Equity has also demonstrated that it had a "progressive discipline" policy that preexisted Ms. Parris and that took no account of gender conformity. *See id.* Under this policy, after receiving a verbal warning, a written warning, and a suspension, Ms. Parris was due to be terminated. *See id.* She does not dispute the policy's existence or its nondiscriminatory nature. *Id.* As noted, she even concedes in her deposition testimony that Equity may have been justified in terminating her under this policy. *Id.* at 45, 82. In an employee misconduct case such as this one, an employer's honest belief (even if erroneous) that an employee violated a work rule constitutes a legitimate, nondiscriminatory reason for firing an employee. *Jones v. Gerwens*, 874 F.2d 1534, 1540 (11th Cir. 1989) (citations omitted). Under such a standard, Equity has met its rebuttal burden.

Once the employer meets its burden to produce a non-discriminatory reason for its actions, the presumption of discrimination is eliminated. *Reeves,* 530 U.S. at 143. To survive summary judgment, the employee must come forward with evidence sufficient to permit a reasonable fact-finder to conclude that the legitimate reasons given by the employer were not its true reasons, but were instead a pretext for discrimination. *Id.* This evidence must reveal "such weaknesses, implausibilities,

inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Cooper v. S. Co.*, 390 F.3d 695, 725 (11th Cir. 2004) (quoting *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997)), *overruled in part on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457–58 (2006).

Ms. Parris has not offered such evidence. In her deposition testimony, she alleges a "conspiracy" by Equity's management and her co-workers to get her fired because they "had a problem with [her] gender." Doc. 21-1 at 62. She admits she has no direct or "physical" evidence of this, and she does not know or recall how Ms. Hale or her supervisor Mr. Smith treated other employees. *Id.* at 62-63. Her only pretext evidence is that which the court has already analyzed. Given the rigorous standards described above, the court finds such evidence insufficient to create a genuine issue of material fact on the pretextual issue as well. "Conclusory allegations of discrimination, without more, are not sufficient evidence to raise an inference of pretext of intentional discrimination where an employer has offered extensive evidence of legitimate non-discriminatory reasons for its actions." *Coutu*, 47 F.3d at 1073-74 (quoting *Young v. General Food Corp.*, 840 F.2d 825, 830 (11th Cir. 1988)) (internal alterations omitted)

**D.    Equity has proven that Ms. Parris cannot show illegal retaliation.**

### 1.    Legal Framework

Ms. Parris also claims that Equity illegally retaliated against her by discharging her for complaining about unlawful workplace discrimination. Doc. 1 at 3.[8] Under Title VII, it is illegal for an employer to discriminate against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). As with a disparate treatment claim, a plaintiff alleging a Title VII retaliation claim must begin by establishing a prima facie case. The plaintiff must show that (1) she engaged in statutorily-protected activity, (2) an adverse employment action occurred, and (3) the adverse action was causally related to the plaintiff's protected activities. *Coutu*, 47 F.3d at 1074. If a plaintiff makes out her prima facie case, the burden shifts to the defendant to produce legitimate reasons for the adverse

---

[8]In her EEOC filing, Ms. Parris appears to argue that Equity also retaliated against her *before* her termination. *See* Doc. 21-4 at 36. She cites an incident where her supervisor at that time, Bobby Crays, shifted her from one work area to another within her department. *Id.* The court will not address whether her failure to state this grievance in her Complaint disqualifies it from consideration. Nor will it resolve whether Mr. Crays's decision qualifies as an "adverse employment action." For the present purposes, the court will dismiss the claim because Ms. Parris does not proffer *any* evidence that Mr. Crays was aware of her internal workplace complaint. Evidence of such knowledge is a condition precedent for asserting a retaliation claim. *See Brochu v. City of Riviera Beach*, 304 F.3d 1144, 1156 (11th Cir. 2002) (reversing denial of judgment as a matter of law and finding no retaliation because of evidence that decision-maker "did not contemporaneously know about the [protected activity]").

employment action. *Shannon v. Bellsouth Telecomms., Inc.*, 292 F.3d 712, 715 (11th Cir. 2002) (citation omitted). "If the defendant does so, the plaintiff must show that the reasons the defendant gave were pretextual." *Id.* (citation omitted).

### 2.    Analysis

Equity does not deny that Ms. Parris engaged in protected conduct by complaining of her workplace treatment or that her termination qualified as an adverse employment action. Doc. 20 at 27. Rather, it disputes that the first action causally relates to the second. *Id.* To establish such a causal connection, a plaintiff must show that (1) the decision-makers were aware of the protected conduct and (2) the protected activity and the adverse actions were not "wholly unrelated." *Shannon*, 292 F.3d at 716 (quoting *Gupta v. Fla. Bd. of Regents*, 212 F.3d 571, 590 (11th Cir. 2000)). "Close temporal proximity between the protected activity and the adverse action may be sufficient to show that the two were not wholly unrelated." *Bass v. Bd. of County Comm'rs, Orange County., Fla.*, 256 F.3d 1095, 1119 (11th Cir. 2001) (citation omitted), *overruled in part on other grounds by Crawford v. Carroll*, 529 F.3d 961 (11th Cir. 2008); *see also McCann v. Tillman*, 526 F.3d 1370, 1376-77 (11th Cir. 2008) (holding that five days was sufficient to satisfy the "close temporal proximity" test of the causation element and that six weeks "arguably satisfies" this requirement); *Farley v. Nationwide Mut. Ins. Co.*, 197 F.3d 1322, 1337 (11th Cir.

1999) (holding that seven-week time frame was "sufficiently proximate to create a causal nexus" when employers were aware of plaintiff's EEOC charge shortly after its filing); *Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir. 1986) ("The short period of time [one month] . . . between the filing of the discrimination complaint and the plaintiff's discharge belies any assertion by the defendant that the plaintiff failed to prove causation.") (citation omitted).

Ms. Parris formally complained about her treatment at Equity on two occasions, only one of which qualifies for analysis here.[9] On February 23, 2011, she contacted Equity's hotline and complained of "harassment/discrimination" surrounding a workplace incident in which she had been suspended for inadvertently striking another employee with machine equipment. Doc. 21-1 at 47-50; Doc. 21-5 ¶ 13. When asked on what basis she had been harassed or discriminated against, she replied, "[s]exual. My life style, I'm in transition." Doc. 21-1 at 48; Doc. 21-5 ¶ 13. She produces no direct evidence here that this complaint caused her termination. She relies on the bare fact that her discharge followed it by forty-two days.

---

[9] Her second complaint occurred on May 4, 2011, following her termination. Doc. 21-1 at 50. Because it took place after her discharge, it cannot serve as a basis for a retaliation claim. *See, e.g*, *Griffin v. GTE Fla., Inc.*, 182 F.3d 1279, 1284 (11th Cir. 1999) ("At a minimum, [the plaintiff] must show that the adverse act followed the protected conduct; this minimum proof stems from the important requirement that 'the employer was actually aware of the protected expression at the time it took adverse employment action.'") (quoting *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993)).

The court finds the window between Ms. Parris's complaint and her termination sufficiently close to satisfy her prima facie case. But Equity persuasively argues that she cannot prove that its legitimate, non-retaliatory reasons for terminating her were pretextual. *See* Doc. 20 at 27-30. As with Ms. Parris's disparate treatment claim, Equity cites Ms. Parris's continuous violations of its "progressive discipline" policy as its legitimate reason for discharging her. *Id.* at 28. To recount briefly, her superiors issued her a verbal warning on January 7, 2011, for allegedly having a dispute with her co-worker. Doc. 21-1 at 35. On January 13, 2011, she was issued a written warning for insubordination when she supposedly refused an instruction to go to a certain work area. *Id.* at 38. As described above, Equity then suspended her on January 31, 2011, after it claimed she (unintentionally) struck a co-worker with the machine she was operating. *Id.* at 39. Finally, on April 6, 2011, Equity terminated her for allegedly failing to record her break time accurately. These disciplinary violations qualify as legitimate termination bases under Equity's "exceedingly light" rebuttal burden. *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983); *see also Tipton v. Can. Imperial Bank of Commerce*, 872 F.2d 1491, 1495 (11th Cir. 1989) (classifying insubordination as a legitimate, non-retaliatory reason for discharge).

In response, Ms. Parris does not offer convincing pretextual evidence. In her

deposition testimony, she contested some alleged details of her original infraction, but she acknowledged the dispute occurred and that she had said at the time that the co-worker "made [her] sick." Doc. 21-1 at 35. Although she flatly denied any insubordination justifying her second warning, she admitted that she had signed the warning at the time. *Id.* at 38-39. She also vigorously challenged the merits of her suspension and later termination. *See id.* at 39-46.

But these disputes are not material on the pretextual issue. They do not rise to the level of evidence that reveals "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could find them unworthy of credence." *Cooper*, 390 F.3d at 725. Ms. Parris certainly does not point to *any* employees who (1) committed similar transgressions as she had, (2) did not complain about workplace treatment, and (3) who then maintained employment thereafter. Nor does she point to any genuine issue of material fact that would allow a fact-finder to infer that Equity's justifications were pretextual. Her retaliation claim thus fails as a matter of law.

## VI.    Conclusion

Equity merits summary judgment on both of Ms. Parris's claims. It has demonstrated that Ms. Parris cannot make her prima facie case for discriminatory

discharge on the basis of her gender nonconformity. Even assuming she adequately makes such a case, she does not offer any persuasive evidence that Equity's legitimate, nondiscriminatory reasons for terminating her were pretextual. The same goes for Ms. Parris's retaliation claim. While the proximity of her termination to the complaint she lodged with Human Resources about her workplace treatment suggests a causal relation sufficient to satisfy her prima facie burden, she is likewise unable to show pretext.

## VII.   Order

For the foregoing reasons, Equity's Motions to Strike and for Summary Judgment are due to be **GRANTED** and Ms. Parris's Motion to Strike is due to be **DENIED**. An order dismissing the case will be entered separately.

**DONE** and **ORDERED** this the 7th day of August, 2013.

**VIRGINIA EMERSON HOPKINS**
United States District Judge